FILED FOR RECORD
CASS COUNTY, TEXAS
6/17/2022 9:06 AM
JAMIE ALBERTSON
DISTRICT CLERK

CAUSE NO. 22C215

| | | |
|---|---|---|
| CHRISTOPHER M. BURSON, | § § § § | IN THE DISTRICT COURT |
| Plaintiff, | § § | |
| vs. | § § § | OF CASS COUNTY, TEXAS |
| GRAPHIC PACKAGING INTERNATIONAL, LLC., | § § § § | _____ JUDICIAL DISTRICT |
| Defendant. | § § | |

### PLAINTIFF'S ORIGINAL PETITION

**TO THE HONORABLE JUDGE OF SAID COURT:**

Christopher M. Burson ("Plaintiff"), files this Original Petition complaining of and about Graphic Packaging International, LLC., ("GPI" or "Defendant"), and for cause of action would show the following:

### I. DISCOVERY CONTROL PLAN

1. Plaintiff intends to conduct discovery under Level 2 pursuant to Rule 190 of the Texas Rules of Civil Procedure. However, Plaintiff reserves the right to move this Court to enter a discovery control plan in accordance with Rule 190.4 of the Texas Rules of Civil Procedure.

### II. PARTIES AND SERVICE

2. Plaintiff, Christopher M. Burson, is a citizen of the United States and the State of Texas and resides in Cass County, Texas.

3. Defendant is a Foreign limited liability company. It has made an appearance in this lawsuit. It may be served with process by serving their registered agent, Corporation Service Company dba

*Plaintiff's Original Petition*


EXHIBIT A

CSC - Lawyers Incorporating Service Company, at 211 E. 7th Street, Suite 620 Austin, TX 78701. Citation is requested at this time.

### III. JURISDICTION AND VENUE

4. This Court has jurisdiction as this action arises under Texas Commission on Human Rights Act, Texas Labor Code § 21.001, et al.

5. Venue is proper in Cass County, Texas under Texas Civil Practice and Remedies Code §15.002 as all or a substantial part of the events or omissions giving rise to the claim occurred in this county.

6. Jurisdiction is exclusive in state court. There is no basis for removal to federal court, because: (a) Burson does not bring any claims under any federal law; and (b) there is not complete diversity of citizenship between the parties. Rather, both Burson and GPI are citizens of Texas.

### IV. NATURE OF THE ACTION

1. This is an action brought pursuant to Chapter 21 of the Texas Labor Code and the Texas Commission on Human Rights Act ("TCHRA") to correct and recover for Defendant's unlawful TCHRA retaliation, disability discrimination, and to deter Defendant from continuing its pattern of unlawful employment practices.

### V. FACTUAL BACKGROUND

2. Plaintiff Christopher M. Burson (hereinafter "Plaintiff" or "Burson") has been employed by Graphic Packaging International, LLC., (hereinafter "GPI") as an Apprentice Worker since February 2, 1992.

3. Defendant is an international packaging company that regularly conducts business in Queen City, Texas.

4. Plaintiff suffers from PTSD and has been diagnosed with Bipolar syndrome. This affects

his mental health and hinders his self-esteem which can cause him to feel overwhelmed at times.

5. Plaintiff's management team, HR clerk Ms. Vanessa Schoen (hereinafter "Ms. Schoen") and union VP Derous Byers (hereinafter "Mr. Byers"), are extremely harsh to Burson, they continuously disregard his mental condition. In 2018, manager John Eason (hereinafter "Mr. Eason"), announced his retirement, Burson felt intrigued to apply for the new position. Burson had all the necessary requirements to apply for the position, he also held the most seniority amongst the other apprentices.

6. In the first quarter of January 2019, Burson was informed that he was selected for the straight day job. Burson was soon approached by Mr. Byers, upon speaking to him he immediately started harassing Burson in a mimicking manner and aggressively told him that he would not receive a raise in his new position, but instead would receive a pay deduction. Burson voiced understanding to Mr. Byers, and expressed he had his financial matters in order; therefore, his current pay would suffice and he would work any overtime that he was allowed. Mr. Byers became irate and continued to berate Burson in front of fellow colleagues. Mr. John Eason (hereinafter "Mr. Eason") witnessed the ill treatment Burson was receiving, no one interfered to try to deescalate the situation.

7. The following day a special meeting was held by the operator union vice president, Mr. Byers, and the supervisor of finished products, Mr. Troy Ashmore who is the head man of the warehouse, and HR clerk Vanessa Schoen scheduled a staff meeting, during this time management discussed with staff that Burson had declined the position due to the pay cut discrepancy. The meeting lasted 2 1/2 hours, Burson was intentionally left out of the meeting, as it was scheduled on Mr. Byers off day. Burson had discussed with Ms. Schoen, that he was interested in the new position and was eager to start the new role regardless of the pay rate.

8. Burson was later notified of the meeting that as held without him. Mr. Arthur Dukes (hereinafter "Mr. Dukes") approached Burson in an agitated manner and demanded to know why Burson had declined the position. Mr. Dukes informed Burson that he had already made the schedule reflecting Burson in the new position. Burson confirmed with Mr. Dukes that he accepted the position; he was not sure why Ms. Schoen relayed to him that he had declined the offer.

9. Burson in return reassured Ms. Schoen that he was very much interested in the position regardless of the stipulations management was creating regarding the no pay increase. Burson acknowledged he would make it work for him and would take on the new role with the same pay.

10. In Spring 2019, warehouse area supervisor, Mr. Dukes, was terminated. His termination soon led to many problems. Plaintiff and Mr. Dukes worked well together and had a solid workflow, but with his absence, the team no longer carried their weight as they should and soon started to cut corners on production and work quality.

11. Burson filed reports on every incident that he encountered to his supervisor Mr. Shaun Watson, which became very frequent.

12. On or around July 25th, 2019, Burson loaded a reject car. Burson inspected the vehicle and was required to check its weight. Somehow the vehicle was displaying a higher weight than what it originally started with, somehow the cargo had added weight to it without properly documenting it. Burson ran a new printout of the final tally, Burson showed this to the operators on duty and also to the Warehouse Safety Lead, Mr. Charlie Carr (hereinafter "Mr. Carr"), but no one could explain how that could have happened, during the discussion it was brought up that Burson should bring it to customer service's attention just in case there was a glitch in the system or weigh stations, this would document the weight discrepancy and allow proper documentation to fix and adjust the correct weight.

13. Burson discussed the weight discrepancy with the warehouse supervisor, Mr. Shawn Watson (hereinafter "Mr. Watson"). Mr. Watson confirmed with Burson that he would follow up with him the next day.

14. The next morning, Burson was loading a folding cart reject car, he was approached by Mr. Ashmore. Ashmore questioned Burson and asked what he was doing. Burson responded, "I am loading a folding cart reject car." Ashmore then responded to Burson, 'You're taking the easy way out." Burson was confused, as his position required for him to get paper out in a timely manner. The following morning, Burson spoke with Ms. Debbie Crompton about reject loads. Ms. Debbie relayed to Burson that Mr. Ashmore relayed to customer service to refrain from giving him any easy loads, to find the hardest jobs for him to load, and to not let him take the easy way out. From that day forward Burson started being retaliated against for the complaint he filed regarding the reject car.

15. Management's ill-treatment towards Burson became so hostile to the point that it started to strain and affect his work performance. The work environment became so hostile that Debbie Crompton called to tell Burson to stop directing any questions to her concerning rejects. She was stressed and caught in the line fire between management and Plaintiff, they started to coerce her and forbid her from helping him in any matter regarding his assigned job duties.

16. On or around October 2019, while in the shipping office during shift change Mr. Byers relayed to Plaintiff, that he had lost the day job and would resume rotating shifts without a reason. Burson remained in the position for 8 months.

17. Burson soon became a target for management, Chris Lummus (hereinafter "Mr. Lummus") would speak to Burson aggressively and threaten him with termination if he continued to have work delays. Mr. Lummus would get in Burson's face and try to intimidate him and force him to

perform his duties at a faster rate.

18. On or around October 2019, while in the shipping office during a shift change Mr. Byers disclosed to Burson, in front of peers that he would no longer hold the straight day job and had to resume rotating shifts. Burson was embarrassed as peers listened in to his demotion. Burson soon discovered that Ashmore and Mr. Byers had a meeting regarding his position without his presence.

19. On or around May 2020, Burson became ill, he had contracted a staph infection and was put under medical leave. Burson returned to work after his medical clearance, he submitted his clearance paperwork. Burson had a bandaid in place due to a cut he sustained while shaving, but other than that he was released with no restrictions. Burson was soon approached by Mr. Ala, the shift foreman. Mr. Ala instructed Burson to remain in the office as he was being sent home due to the bandaid in place. Mr. Ala informed Burson that he needed a new doctors note stating he was fully released to return to work.

20. Burson was notified by the union shop steward, Mr. Chris Heildt (hereinafter "Mr. Heildt") that he overheard Mr. Byers expressing to Ms. Schoen that he wanted to fire Burson regardless of his FMLA leave. Burson was in constant fear of losing his job, the environment caused much strain on his mental health.

21. June 14, 2020, Burson's primary physician instructed him to take off a week of work, this was a domino effect due to the harassment and retaliation that was ongoing at work. Burson was continuously being bullied at work and could not handle the stress that management was creating.

22. The work environment triggered Burson's PTSD, Burson felt that management started to alienate him and could feel that they were trying to force him into resignation.

23. Burson took a two-week voluntary layoff so he could attend an emergency appointment that his physician scheduled for him on July 10, 2020, with a referred psychiatrist Dr. Monika

Singhal. On or around July 3rd, 2020, Burson received a phone call from warehouse foreman, Mr. Phillip to report back to work on July 7th, 2020. Mr. Phillip insisted that Burson return sooner, Burson relayed to Mr. Phillip that all personnel prior to him who had requested voluntary time off, were allowed to finish their time off request, he did not understand why he was being forced to return.

24. Burson afraid to lose his job complied and returned the following day. Burson was able to complete two (2) entire days of work, before having to return to his medical appointments that were previously scheduled.

25. Burson received a text message from Mr. Byers demanding a return-to-work date. Byers blatantly expressed to Burson that he needed him to return to work and demanded to know how many more days he was going to be out this time. When Burson was at a medical doctor's appointment, Mr. Byers complained about his absence to Mr. Shawn Watson. Fellow colleagues, Mr. Brian Amox and Charlie Carr overheard Mr. Byers state, "They need to fire Burson's sorry ass."

26. Within the same day Burson received a call from the HR representative, Ms. Laura. She requested for him to bring a doctor's excuse upon his return to excuse his absence, Burson voiced understanding and complied. Burson turned in all of his medical paperwork to Ms. Laura.

27. On or around July 2020, Burson was exposed to COVID-19 and had to take a Covid test, he was immediately instructed to quarantine for fourteen (14) days. During his additional medical time off, he was bombarded with text messages from Human Resources clerks Ms. Laura and Ms. Schoen, they continuously requested doctor notes and instructed that he immediately share records with them to prove that he was under doctor's orders to quarantine. Burson complied and sent copies of progress notes and his hospital discharge. Ms. Schoen went as far as calling Hospitality

ER where Burson was tested for Covid, she was not able to obtain any information regarding his medical records because it would violate HIPPA. Ms. Schoen accused Burson of lying about his testing and quarantine restrictions.

28. Burson was in direct communication with management throughout his leave of absence.

29. On December 4, 2020, Burson attempted to return back to work, upon his return he was notified that his insurance carrier, CIGNA sent wrong paperwork regarding his disability restrictions/ return. GPI relayed to Burson that he was terminated from his position for the reason of "job abandonment".

30. Due to the fact that Defendant failed to properly evaluate Plaintiff's reasonable accommodation request or grant the medical request, Plaintiff was unable to return to work, especially since Defendant denied Plaintiff's request for a reasonable accommodation. Therefore, since Plaintiff's work environment was so intolerable, Defendant constructively terminated Plaintiff.

31. Thus, based on the foregoing, on or about January 8th, 2021, Plaintiff was wrongfully Terminated, he received a termination letter via FED/EX while still under his doctor's care. In GPI's letter they accused Burson of abandoning his job, the letter also noted that GPI had no communication from Burson since September 2020.

32. Burson reported the termination to the TWC, who in return initiated an investigation that confirmed Burson remained in contact with GPI. Burson released of all of his medical paperwork indicating that he was never released to return to work.

33. Ultimately, because of his disability/perceived disability/report of disability (including, but not limited to, failing to provide him with a reasonable accommodation) Burson was wrongfully terminated because of the complaints that he made to Defendant about being

*Plaintiff's Original Petition* 8

discriminated against because of his disability/perceived disability/report of disability (including, but not limited to, failing to provide him with a reasonable accommodation).

## VI. CONDITIONS PRECEDENT

34. All conditions precedent to jurisdiction have occurred or been complied with: a Charge of Discrimination (Charge No. 460-2021-03995) was jointly filed with the Equal Employment Opportunity Commission ("EEOC") and the Texas Workforce Commission Civil Rights Division ("TWC-CRD") and the Plaintiff's lawsuit has been filed within ninety days of receipt of the EEOC's issuance of a right to sue letter.

35. Less than two (2) years have passed since Burson filed his complaint with the EEOC. Burson's suit is entirely brought under the TCHRA. No claims are brought under any federal law.

## VII. CAUSES OF ACTION

### *COUNT ONE*
### RETALIATION UNDER CHAPTER 21 OF THE TEXAS LABOR CODE

36. Chapter 21 of the Texas Labor Code prohibits retaliation against a person who has opposed discrimination by filing a charge or complaint or testified, assisted, or participated in an investigation, proceeding, or hearing under the TCHRA. See Tex. Lab. Code § 21.055.

37. Pursuant to section 21.055 of the Texas Labor Code Plaintiff pleads a cause of action against Defendant for retaliation.

38. The allegations contained in all paragraphs of the Complaint are hereby incorporated by reference with the same force and effect as if set forth verbatim.

39. Plaintiff engaged in protected activity by filing an internal complaint of discrimination with management. Plaintiff engaged in further protected activity by filing a Charge of Discrimination with the EEOC/TWC-CRD. After engaging in protected activity, Plaintiff has experienced additional discrimination and retaliation, Plaintiff was constructively discharged upon his return

to work. The effect of these practices has been to deprive him of equal employment opportunities and otherwise adversely affect his status as an employee.

40. Plaintiff alleges that Defendant retaliated against him by singling him out for excessive discipline, micro-managing his schedule, and threatening him with termination based on his protected activity in violation of Chapter 21 of the Texas Labor Code.

## *COUNT TWO*
## CLAIM FOR DISABILITY DISCRIMINATION UNDER THE TCHRA

41. The allegations contained in all paragraphs of this complaint are hereby incorporated by reference with the same force and effect as if set forth verbatim.

42. Disability discrimination is prohibited by the TCHRA. See TEX. LAB. CODE § 21.051. To establish a prima facie case of disability discrimination under the TCHRA, a plaintiff must show (1) he has a "disability," (2) he is "qualified" for the job, and (3) he suffered an adverse employment decision "because of his disability." Davis v. City of Grapevine, 188 S.W.3d 748, 757 (Tex.App.-Fort Worth 2006, pet. denied) (citing Turco v. Hoechst Celanese Corp., 101 F.3d 1090, 1092 (5th Cir.1996)). As set forth below, Burson satisfies all three elements and also has substantial evidence that GPI's given reason for his termination is a pretext for disability discrimination.

### 1. Burson was Actually Disabled and Regarded as Disabled

43. The Texas legislature enacted the TCHRA with the express purpose to "provide for the execution of the policies embodied in Title I of the Americans with Disabilities Act of 1990 and its subsequent amendments." See TEX. LAB. CODE § 21.001(3). Therefore, both the federal court decisions interpreting the ADA and the federal administrative regulations regarding the ADA guide Texas court's interpretation of "disability" contained in the TCHRA. See Little v. Tex. Dep't

*Plaintiff's Original Petition* 10

of Criminal Justice, 148 S.W.3d 374, 381-82 (Tex. 2004). Under the TCHRA, "Disability" means, "with respect to an individual, a mental or physical impairment that substantially limits at least one major life activity of that individual, a record of such an impairment, or being regarded as having such an impairment." TEX. LAB. CODE§ 21.002(6). As explained below, Burson satisfies both the "actual" and "regarded as" definitions of "disability."

### a) Burson Was Actually Disabled Under The TCHRA

44. The term "disability" must be construed broadly. Id. § 21.002I(a)(1). "Major life activity" includes, but is not limited to, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working. The term also includes the operation of a major bodily function, including, but not limited to, functions of the immune system, normal cell growth, and digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." TEX. LAB. CODE§ 21.002(11-a).

Texas courts have held that an impairment "substantially limit[s]" a person's major life activity when he is:

> [u]nable to perform a major life activity that the average person in the general population can perform; or [s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

*Tex. Dep't of Family & Protective Servs. v. Howard*, 429 S.W.3d 782, 787 (Tex. App.---Dallas 2014, pet. denied)) (quoting *Thomann v. Lakes Reg'l MHMR Ctr.*, 162 S.W.3d 788, 796 (Tex. App.-Dallas 2005, no pet.)).

45. A determination about whether an impairment "substantially limits" a major life activity must be made "without regard to the ameliorative effects of mitigating measures," including medication. TEX. LAB. CODE§ 21.002I(b)(1).

*Plaintiff's Original Petition*  11

46. Here, Burson's PTSD disease qualifies as an actual disability under §21.002(6), in that it is an impairment that, in its unmedicated state, substantially limits his major life activities, including his central nervous system and brain; and his ability to care for himself, perform manual tasks, concentrate, think, and communicate. In short, Burson was and is actually disabled.

### b) Burson Was Regarded As Disabled Under The TCHRA

47. Under the TCHRA, "Regarded as having such an impairment" means "subjected to an action prohibited under Subchapter B or C because of an actual or perceived physical or mental impairment, other than an impairment that is minor and is expected to last or actually lasts less than six months, regardless of whether the impairment limits or is perceived to limit a major life activity." TEX. LAB. CODE § 21.002(12-a). Alternatively, or in addition, Burson was "regarded" as disabled, in that he was terminated because of an actual impairment (PTSD disease), and his PTSD disease is not an impairment that is minor and is expected to last or actually, lasts less than six months. TEX. LAB. CODE§ 21.002(12-a).

### 2. Burson Was Qualified For His Job

48. Under the TCHRA, the plaintiff can satisfy the "qualification" element in one of two ways: (1) by proving that he can perform all essential job functions of his job with or without modifications or accommodations; or (2) by showing that some reasonable accommodation by the employer would enable him to perform the job. Austin State Hosp. v. Kitchen, 903 S.W.2d 83, 91 (Tex. App.-Austin 1995, no writ). Here, Burson could and did perform all the essential functions of his job as an Apprentice Associate, regardless of the fact that he had PTSD. Indeed, he was consistently one of the highest performing Apprentices at GPI. As such, Burson was

"qualified" under the TCHRA.

### 3. Burson Was Terminated Because Of His Disability

49. To prove discrimination circumstantially, courts apply the well-known McDonnell Douglas burden-shifting mechanism. See *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 3 6 L.Ed.2d 668 ( 1973 ). Under the McDonnell Douglas burden-shifting mechanism, once a plaintiff has established a prima facie case of disability discrimination, as Burson has, the burden shifts to the defendant to produce evidence of a legitimate, non-discriminatory reason for the adverse employment action. See Haver v. Coats, 491 S.W.3d 877, 883 n.3 (Tex. App. Houston [ 14th Dist.] 2016, no pet.). If an employer presents evidence that it had a legitimate, nondiscriminatory reason for terminating the plaintiff, then the burden shifts to the plaintiff to raise a genuine fact issue as to whether the employer's reason was a pretext for discrimination. See Haver, 491 S.W.3d at 883 n.3.

GPI claimed that Burson quit. That is false. GPI accused Burson of job abandonment, after he he was under quarantine per his doctor's orders. That GPI gave a false reason for Burson' s separation from the Company is sufficient evidence of pretext and disability discrimination vel non. See, e.g *Haire v. Board of Sup'rs of La. State Univ. Agricultural & Mech. Coll.*, 719 F.3d 356, 365 n. 10 (5th Cir. 2013) (reversing summary judgment for the employer in a discrimination case, and holding that, "[e]vidence demonstrating that the employer's explanation *is false or unworthy of credence* ... is likely to support an inference of discrimination even without further evidence of defendant's true motive.") (italics in original); see also Burton v. Freescale Semiconductor, Inc., 798 F.3d 222, 238-41 (5th Cir. 2015) (genuine issue of material fact existed as to whether terminating an employee for poor performance was pretext for disability discrimination, precluding summary judgment in employee's action alleging violations of the

ADA).

50. Second, pretext is also proven by the fact that GPI retained (and did not attempt to furlough or fire) numerous substantially younger, non-disabled Apprentices who did not perform as well as Burson did. See, e.g., Stewart v. Sanmina Tex. L.P., 156 S.W.3d 198, 212-13 (Tex.App.-Dallas 2005, no pet.) (evidence that lower-performing employees were retained created a genuine issue of material fact as to whether a reduction in force was pretext for discrimination precluded summary judgment); Christie v. Foremost Ins. Co., 785 F.2d 584, 586-87 (7th Cir. 1986) (affirming jury verdict for plaintiff in a discrimination case where the employer alleged that it selected the plaintiff for termination as part of a RIF based on comparative performance, but there was substantial evidence that the plaintiff was a better performer than other employees that the company retained).

## VIII. DAMAGES

51. As a result of Defendant's actions and or omissions described above, Plaintiff sustained the following damages:

   a. Actual damages, including (but not limited to) economic damages (such as past pecuniary losses and future pecuniary losses) and mental anguish damages (pursuant to Texas Labor Code § 451.002(a));

   b. Exemplary damages (pursuant to Texas Labor Code § 451.002(a));

   c. Reinstatement to Plaintiff's former employment position with Defendant (pursuant to Texas Labor Code § 451.002(b));

   d. Injunctive relief to restrain violations of the Texas Labor Code § 451.001 (pursuant to Texas Labor Code § 451.003);

   e. Attorneys' fees;

   f. Costs incurred as a result of this lawsuit;

   g. Pre-judgment interest;

   h. Post-judgment interest; and

  i.  All other relief to which Plaintiff is entitled.

52. Pursuant to Rule 47 of the Texas Rules of Civil Procedure, Plaintiff hereby seeks monetary relief over $200,000.00, but not more than $5,000,000.00, as well as non-monetary relief. Among the relief Plaintiff is seeking includes (but is not limited to) attorneys' fees, costs, pre-judgment interest, and post-judgment. Plaintiff also seeks a demand for judgment for all the other relief to which Plaintiff deems himself entitled. The damages being sought by Plaintiff are within the jurisdictional limits of the court. Plaintiff further requests that the non-expedited rules apply in this case.

## IX. EXEMPLARY DAMAGES

53. Plaintiff would further show that the acts and omissions of Defendant complained of herein were committed with malice or reckless indifference to the protected rights of the Plaintiff. In order to punish said Defendant for engaging in unlawful discrimination and to deter such actions and/or omissions in the future, Plaintiff also seeks recovery from Defendant for exemplary damages.

## X. JURY DEMAND

54. Plaintiff demands a jury on all issues to be tried in this matter and has submitted the jury fee.

## XI. PRAYER

For the reasons set forth above, Plaintiff, Christopher Mike Burson, respectfully prays that the Defendant be cited to appear and answer herein, and that upon a final hearing of the cause, judgment be entered for the Plaintiff against Defendant for damages in an amount within the jurisdictional limits of the Court, including monetary relief over $200,000.00 but not more than $5,000,000; exemplary damages, together with interest as allowed by law; costs of court and such

other and further relief to which the Plaintiff may be entitled at law or in equity.

[SIGNATURE BLOCK TO FOLLOW]

Respectfully Submitted,

Kennard Law P.C.

/s/ Alfonso Kennard

Alfonso Kennard
Texas Bar No. 24036888
Alfonso.Kennard@kennardlaw.com
Eddie Hodges, Jr.
Texas Bar No.: 24116523
Eddie.Hodges@kennardlaw.com
5120 Woodway Dr., Suite 10010
Houston Texas 77056
Main: (713) 742-0900
Fax:   (832) 558-9412

**ATTORNEYS FOR PLAINTIFF**